IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MIGUEL FIGUEROA, | ) | CASE NO. 1:16CV1126 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Miguel Figueroa ("Figueroa") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 14.

As set forth more fully below, the Administrative Law Judge ("ALJ") erred when she failed to follow the treating physician rule in considering the opinion of Figueroa's treating physician, Dr. Morton.  Specifically, the ALJ assigned "some" weight to Dr. Morton's opinion, but she did not consider whether it was supported by medically acceptable clinical and laboratory diagnostic techniques or consistent with other substantial evidence in the record, nor did she provide good reasons for giving it less than controlling weight.  As a result, the undersigned recommends that the Commissioner's decision be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

## I. Procedural History

1

Figueroa filed an application for SSI on January 7, 2013, alleging a disability onset date of January 1, 2008.  Tr. 193.  He alleged disability based on the following: mental illness and breathing issues.  Tr. 228.  After denials by the state agency initially (Tr. 124) and on reconsideration (Tr. 140), Figueroa requested an administrative hearing.  Tr. 77.  A hearing was held before Administrative Law Judge Penny Loucas ("ALJ") on November 17, 2014.  Tr. 34-75.  At the hearing, Figueroa amended his alleged onset date to June 21, 2012.[1]  Tr. 36-37.  In her January 8, 2015, decision (Tr. 20-29), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Figueroa can perform, i.e., he is not disabled.  Tr. 28.  Figueroa requested review of the ALJ's decision by the Appeals Council (Tr. 15) and, on March 10, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Figueroa was born in 1968 and was 44 years old on the date his current application was filed.  Tr. 28, 193.  He completed eleventh grade.  Tr. 60.  He previously worked as a laborer in a refrigeration plant and a bagger and cart person at a grocery store.  Tr. 56-59.

### B.  Relevant Medical Evidence[2]

In 2003, Figueroa had an MRI of his lumbar spine that showed degenerative changes that were the worst at L4-5, where there was "a moderate degree of spondylostenosis, with narrowing

---

[1] Figueroa filed earlier applications for SSI and Disability Insurance Benefits that were denied by a different ALJ on April 26, 2012.  Tr. 20, 90.

[2] Figueroa does not challenge the ALJ's findings regarding his mental impairments or non-orthopedic physical impairments.  *See* Doc. 15, p. 4, n.2.  Accordingly, only the medical evidence relating to Figueroa's challenged physical impairments (back and hip problems) are summarized and discussed herein.

of the spinal canal" and mildly narrowed neural foramina with no significant compromise to the existing nerve roots.  Tr. 1167-1168.

On March 22, 2013, Figueroa went to the emergency department for a depressed mood. Tr. 470.  He explained that he missed his group therapy that morning, which he usually attended three times a week.  Tr. 470.  Upon physical exam, he had a normal gait and was able to move all extremities. Tr. 472.

On May 22, 2013, Figueroa saw Elva Thompson, CPN, complaining of difficulty breathing, abdominal pain that goes up to his left chest, and black stools.  Tr. 400.  Upon exam, his back was symmetric, he had no curvature or tenderness, and he had a normal range of motion in his spine.  Tr. 400-401.  His extremities were normal and he had a normal gait, sensation, and pulses.  Tr. 401.  Thompson diagnosed him with angina; she noted that his pain improved with nitroglycerin and recommended that he go to the emergency room.  Tr. 401.  Upon examination in the emergency room, his extremities had no cyanosis, edema, or clubbing; his musculoskeletal strength was symmetric and 5/5; his gait was normal; and his sensation was grossly intact.  Tr. 387.

On May 28, 2013, Figueroa followed up with Thompson.  Tr. 369.  His chest pain had resolved but he still had left abdominal pain.  Tr. 369.  He denied arthritic pain, joint swelling, and muscle weakness.  Tr. 370.  Upon exam, his extremities were normal and he had intact muscle strength.  Tr. 371.  He had normal pulses, reflexes and sensation, a normal range of motion in his spine, his back was symmetric with no curvature or tenderness, and his gait was normal.  Tr. 371.

On May 29, 2013, Figueroa had a CT scan of his abdomen and pelvis.  Tr. 381-382.  The scan revealed degenerative spurring in the superior acetabulum (hip) bilaterally, right greater

than left, and which may relate to femoral acetabular impingement syndrome.  Tr. 382.  The reviewer wrote, "Clinical correlation with pain is suggested; elected orthopedic consultation may be obtained if clinically warranted."  Tr. 382.

On June 4, 2013, Figueroa returned to Thompson for a follow-up visit.  Tr. 364.  His abdominal pain had resolved.  Tr. 364.  He complained of back and left hip pain for the past week.  Tr. 364.  Upon exam, he had positive midline and paraspinal tenderness with muscle spasm in his left paraspinal lumbar region, positive straight leg raising in his left leg, and decreased range of motion in his left hip.[3]  Tr. 365.  He had a normal gait, normal and symmetric reflexes, and grossly intact sensation.  Tr. 365.  Thompson referred Figueroa to orthopedics.  Tr. 365.

On June 18, 2013, Figueroa returned to Thompson for a follow-up visit.  Tr. 560.  He complained of left hip discomfort and stated that he was no longer able to ride his bike due to hip pain.  Tr. 560.  Upon exam, he had paraspinal tenderness in his lumbar region, bilateral hip tenderness, and decreased range of motion; he also had a normal gait, normal and symmetric reflexes, and grossly intact sensation.  Tr. 561.  Thompson again referred Figueroa to orthopedics.  Tr. 561.

On July 8, 2013, Figueroa saw Michael Silverstein, M.D., of the orthopedic surgery department.  Tr. 566-567.  Figueroa reported hip (left greater than right) and back pain that was made worse when going from a sitting to standing position and improved when lying down.  Tr. 566.  Upon exam, he ambulated without assistance, had full strength in his right and left lower extremities, and intact sensation.  Tr. 566.  He had left lower extremity pain with hip flexion and

---

[3]  In a straight leg-raising test, the patient lies down supine, fully extends the knee, and lifts the leg.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1900.  Leg pain when the leg is raised 30-90 degrees (a positive straight leg raise) indicates lumbar radiculopathy.  *Id.*

adduction.  Tr. 566.  Dr. Silverstein recommended Figueroa attend his upcoming appointment with pain management and rehabilitation ("PM&R") and weight bear as tolerated.  Tr. 567.

Figueroa saw Thompson the next day, reporting that he needed x-rays of his spine.  Tr. 571.  Upon exam, he had bilateral hip tenderness and decreased range of motion, but an intact sensory exam, normal and symmetric reflexes, and a normal gait.  Tr. 572.  A lumbar x-ray showed no abnormalities.  Tr. 576.

On July 22, 2013, Figueroa went to PM&R and saw A. Sophia Tritle, M.D., complaining of left hip pain.  Tr. 578.  He reported that he has had pain bilaterally for years and that it gradually had worsened.  Tr. 578.  The pain, left side much greater than right, was achy and sometimes radiated to his back or knee and worsened with activity.  Tr. 578.  It sometimes woke him at night.  Tr. 578.  He reported that he likes to be "quite active" but was limited in his ability to walk for long distances and play with his children.  Tr. 578.  Because of his history of substance abuse, he did not want to take a narcotic for pain.  Tr. 578.  He had taken Naproxen "sporadically in the past," which "did seem to help" but "he ran out."  Tr. 578.  He also reported that he currently took "an occasional Robaxin" which seemed to help somewhat.  Tr. 578.  Upon exam, he had normal reflexes in his bilateral lower extremities, negative Babinski's sign bilaterally, normal sensation, and 5/5 strength bilaterally.  Tr. 580.  His pelvis was symmetric, he had normal lumbar lordotic curve and no evidence of scoliosis.  Tr. 580.  He had a mild decrease in forward flexion with end of range pain and tenderness of his lumbosacral paraspinal muscles bilaterally upon palpation, with no evidence of spasm.  Tr. 580.  He had negative straight leg raising tests seated and supine and a negative FABER test.[4]  Tr. 580.  His hip exam showed pain and limitations with flexion and internal rotation.  Tr. 580.  Dr. Tritle prescribed Naproxen, a left hip injection, hip x-rays, and physical therapy.  Tr. 581.

---

[4]  A FABER test, also called a Patrick test, indicates arthritis of the hip.  *See* Dorland's, at 1711, 1896.

On August 14, 2013, Figueroa received a left hip injection.  Tr. 596-597.

Figueroa underwent physical therapy from August 15, 2013, to October 8, 2013.  Tr. 603-607, 741-743, 750-752, 759-761, 769-771.  At his initial appointment, he reported constant left-sided hip pain, worse with sitting evenly and lying in bed, that sometimes traveled into his left thigh and calf.  Tr. 604.  He was full weight bearing, ambulated without an assistive device, was independent with self-care, independent with activities of daily living, able to enter the facility taking two steps with rails, and had taken the bus to therapy.  Tr. 604, 605.  His strength was grossly within functional limits for gait and transfers and his sensation was intact to light touch in his lower extremities.  Tr. 605.  Physical therapy goals included decreasing pain, increasing walking tolerance from 10 minutes to 30 minutes without an increase in symptoms and improving his ability to lift an object from the floor.  Tr. 606.  At follow-ups visits, his gait was independent without an assistive device.  Tr. 733, 742, 751, 760, 770.

On August 23, 2013, Figueroa saw Thompson for a follow-up visit.  Tr. 701.  Upon exam, he had mild paraspinal tenderness in his lumbar region, bilateral hip tenderness, and decreased range of motion.  Tr. 701-701.  He also had a normal gait, normal and symmetric reflexes, and intact sensation.  Tr. 702.  On October 22, 2013, he returned to Thompson complaining that his hip pain was getting worse after his hip injection.  Tr. 779.

On November 4, 2013, Figueroa saw orthopedic doctor Chad Fortun, M.D., complaining of left hip and left radicular pain.  Tr. 796.  He reported a few days of relief following his hip injection in August.  Tr. 796.  Upon exam, he had no significant groin pain with log roll, a positive straight leg raising test, an intact motor exam, and some subjective paresthesia of his left foot.  Tr. 796.  Dr. Fortun wrote that his exam was "very limited by pain" and ordered a lumbar

MRI and a referral for a spine consultation.  Tr. 796.  On November 6, Figueroa saw Thompson for a follow-up visit for abdominal pain; his gait was normal.  Tr. 803.

A lumbar MRI taken on November 14, 2013, showed disk degeneration most marked at the L4-5 level, i.e., left L4-5 disk extrusion with marked resultant nerve root compression.  Tr. 800.

On December 6, 2013, Figueroa saw Thompson for a follow-up visit complaining of back pain.  Tr. 811.  He was ambulatory, denied new numbness or weakness, and stated that he had begun wearing a nerve stimulator that belonged to his brother-in-law, which had been helping.  Tr. 811.  His insurance had not approved pain patches and he requested muscle relaxers and Motrin.  Tr. 811.  He had not followed up on his spine consultation.  Tr. 811.  Upon examination, he had diffuse paraspinal muscle spasms and a negative straight leg raise test.  Tr. 811.  His muscular strength was intact and he had no focal weakness appreciated.  Tr. 812.  He was started on a Medrol dose pack, Robaxin and Neurontin; Thompson recommended topical Voltaren Gel, given his inability to take oral medication due to gastrointestinal problems, contraindications with other medication he was on, and insurance limitations, and noted that Figueroa would not consent to using opioids due to his history of drug abuse.  Tr. 812.

On December 16, 2013, Figueroa followed up with Antwon Morton, D.O., with PM&R, complaining of left hip pain.  Tr. 821.  He also reported low back pain that had begun in 1990 after an L4-L5 disc herniation.  Tr. 821.  The pain was constant, of varying intensity, and he had pain/numbness/tingling that radiated into his left buttock and down to his left ankle.  Tr. 821.  He reported stumbling frequently but that he had not fallen.  Tr. 821.  He had pain when sitting on his left gluteal area with increased paresthesia and difficulty using stairs.  Tr. 821.  The pain was worse at night and he felt some relief when lying on his back and rotating his legs to the right.

Tr. 821.  Upon exam, he had 3+ reflexes in the bilateral lower extremities and normal sensation, except for decreased sensation to light touch in his left L5 dermatone compared to his right.  Tr. 824.  He had 5/5 strength in his lower right extremity and 4/5 in the lower left.  Tr. 824.  His pelvis was symmetric, his lumbar lordotic curvature was normal, and there was no evidence of scoliosis, although he leaned to the left when standing.  Tr. 824.  He had a mild decrease in forward flexion with end of range pain and tenderness in his lumbosacral paraspinal muscles bilaterally with no evidence of a spasm.  Tr. 824.  He had an antalgic gait.  Tr. 825.  Straight leg raising test was positive, but negative in the seated position when distracted.  Tr. 824.  Dr. Morton assessed Figueroa with bilateral femoral acetabular impingement syndrome (radiographically right worse than left, but clinically left worse than right), current left L5 radiculopathy, lumbar spondylosis, low back pain and antalgic gait.  Tr. 825.  He increased Figueroa's dosage of gabapentin, administered a Toradol injection for pain, referred him for a left L5 epidural steroid injection for radiculopathy and referred him for physical therapy for mobility, ambulation, cane evaluation, hip stretching, strengthening and range of motion.  Tr. 825.

On December 23, 2013, Figueroa reported to Thompson that he was feeling much better with an increase of Gabapentin and Robaxin and was content with his progress.  Tr. 831.  Upon exam, he had minimal paraspinal tenderness in the lower lumbar spine, intact muscular strength, and no focal weakness.  Tr. 832.

On January 31, 2014, Figueroa followed up with Dr. Morton, complaining that his pain was bad that day and was "affecting his 'whole lifestyle.'"  Tr. 838.  The last seven days his pain had been a 7-10/10.  Tr. 838.  He reported that his pain was most alleviated with a TENS unit and that his Gabapentin and Robaxin have been helping as well, but that he was out of his

Robaxin.  Tr. 838.  He was ambulating with a straight cane and had not been performing his home exercises due to pain.  Tr. 838.  He reported that he was evaluated by neurosurgery and offered intervention but was recommended conservative treatment first, and that he had not had his epidural steroid injection and needed to reschedule his appointment.  Tr. 838.  Examination findings were the same as his previous visit, except that he had an antalgic gait.  Tr. 841-842.  Dr. Morton administered another Toradol injection, rescheduled the epidural injection, and referred Figueroa to physical therapy, to be scheduled once his pain was under better control.  Tr. 842.

On February 25, 2014, Figueroa underwent a left L5 transforaminal epidural steroid injection.  Tr. 973.  Following treatment, he ambulated with a steady gait.  Tr. 978.

On March 12, 2014, Figueroa was evaluated for physical therapy.  Tr. 982-987.  He reported constant low back pain, 10/10, and left worse than right.  Tr. 984.  His pain was made worse with prolonged sitting, prolonged standing, and prolonged walking, lying down, sleeping at night, rising from a chair, lifting, bending, and ascending/descending stairs.  Tr. 984.  His pain improved with medication and rest.  Tr. 984.  Upon exam, he had limited ranges of motion in his trunk, decreased muscle strength (left worse than right), decreased sensation to light touch in his left lower extremity, positive straight leg raising and positive tenderness over his entire back.  Tr. 984-985.  Functional testing revealed a labored but independent "sit to stand," assistance needed with bed mobility and lifting an item from floor to waist, and a slow, antalgic gait.  Tr. 986.  Other testing (e.g., hip range of motion, joint mobility) was not assessed due to his increased complaints of pain.  Tr. 985-986.  The physical therapist concluded that treatment was inappropriate at that time due to his increased pain with testing and recommended Figueroa follow up with his referring physician.  Tr. 986.

9

Figueroa followed up with Dr. Morton on March 17, 2014.  Tr. 991.  He reported that his steroid injection gave him 30 to 40% relief for about one week.  Tr. 991.  He was ambulating with a straight cane and complained of difficulty with putting on shoes, dressing, lifting, and carrying.  Tr. 991-992.  His examination findings were the same as his prior visit.  Tr. 994. Dr. Morton administered another Toradol injection, considered a re-referral for a repeat epidural steroid injection, and recommended pool therapy.  Tr. 995.

Figueroa saw Thompson on March 31, 2014, complaining of low back and left hip pain. Tr. 1221.  He reported that his PM&R doctor was contemplating surgery, that he was going to start pool therapy, and that if pool therapy failed he was going to have surgery.  Tr. 1221.  His electric stimulation therapy was helping but he tried to use it only at night.  Tr. 1221.  Upon examination, he had paraspinal muscle tenderness in his lower lumbar region and left hip tenderness.  Tr. 1221.  He was limping with his left leg and using a cane.  Tr. 1221.  He had no tremor or focal weakness appreciated.  Tr. 1222.

On May 19, 2014, Figueroa followed up with Dr. Morton.  Tr. 1226.  He reported that his left leg radiating symptoms had improved to 7/10 and he felt he was able to walk a little further compared to his last visit.  Tr. 1226.  He had throbbing pain in his left leg at night.  Tr. 1226.  He reported not having worked for one year.  Tr. 1226.  He ambulated with a straight cane when necessary but had not used it that day.  Tr. 1227.  He was able to do home exercises and noted improvement in his activities of daily living.  Tr. 1227.  His examination findings were similar to his last visit on March 14: some decreased sensation, slightly reduced strength in his left leg, reduced range of lumbar and hip motion, lumbar tenderness, antalgic gait, and a positive left straight left raise test but a negative seated leg raise when distracted.  Tr. 1230.

At a psychiatric appointment on June 27, 2014, Figueroa reported, "My back is good. I've been doing stretches and stuff."  Tr. 1012.  His back was "a little sore from work the other day"; he explained that he had been working doing landscaping with his boss, but that it was hard on him so he had not been doing it as much lately.  Tr. 1012.

On October 22, 2014, Figueroa saw Dr. Morton for left hip pain.  Tr. 1331.  He had been doing well until the past Friday when he was helping his mother move boxes.  Tr. 1331.  He reported not having worked in one year.  Tr. 1331.  He was ambulating with a straight cane as needed, was able to perform home exercises, which "really seems to help with symptom relief," and reported improvement with activities of daily living.  Tr. 1332.  He was out of his Robaxin. Tr. 1332.  Examination findings were the same as his previous visit, except that his antalgic gait had improved compared to his last visit.  Tr. 1336.  Dr. Morton administered another Toradol injection for pain and continued his medications.  Tr. 1336.

### C.  Medical Opinion Evidence

#### 1.  Treating Source

On June 25, 2014, Dr. Morton completed a Medical Source Statement on Figueroa's behalf.  Tr. 1001-1002.  He opined that, due to Figueroa's lumbar MRI results from November 2013 and his as-needed cane use, Figueroa could lift/carry 10 to 25 pounds occasionally and 5 to 10 pounds frequently; stand and/or walk three to four hours per day, 20 to 30 minutes without interruption; sit for six hours per day, 30 to 40 minutes without interruption; could occasionally climb, balance, stoop, and crouch and could rarely kneel or crawl; and should be restricted from heights and moving machinery.  Tr. 1001-1002.  He also opined that Figueroa needed to be able to alternate at-will between sitting/standing/walking, had to elevate his legs at will, and would require additional rest periods outside the standard lunch and two fifteen-minute breaks totaling

11

four hours.  Tr. 1002.  He stated that Figueroa had been prescribed a cane and a TENS unit.  Tr. 1002.

### 2.  State Agency Reviewers

On April 26, 2013, state agency physician Steve E. McKee, M.D., reviewed Figueroa's record.  Tr. 118-120.   Regarding Figueroa's RFC, Dr. McKee opined that Figueroa could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and should avoid concentrated exposure to extreme cold and heat, humidity, fumes, odors, dust, gases, and poor ventilation.  Tr. 119-120.

On July 22, 2013, state agency physician Linda Hall, M.D., reviewed Figueroa's record.  Tr. 135-136.   She opined that Figueroa could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, occasionally climb ramps/stairs, stoop, crouch and crawl, should never climb ladders/ropes/scaffolds, should avoid concentrated exposure to extreme cold, extreme heat, and humidity, and should avoid moderate exposure to fumes, odors, dust, gases, and poor ventilation.  Tr. 135-136.

### D.  Testimonial Evidence

### 1. Figueroa's Testimony

 Figueroa was represented by counsel and testified at the administrative hearing.  Tr. 41-65.  He testified that he lives with his mother at her house.  Tr. 46, 48.  She has a shed behind the house with a bed and a television in it and he spends time there with his dogs.  Tr. 48-49.  He has two children who are 16 and 18 years old but he does not see them.  Tr. 51.  He goes to group

therapy sessions for mental health issues and attends narcotics anonymous meetings.  Tr. 50.  He takes all his prescribed drugs.  Tr. 50.

Figueroa described his back pain as being in his lower back and radiating down his right leg.  Tr. 43.  He feels pinching every time he lifts his leg.  Tr. 43.  Sometimes his back "will pinch up and then I like twist it for like a month or something and I have to take some type of like gabapentin ... [that] helps my muscle and it straighten[s] me out."  Tr. 44.  But he will still have the pinching down his leg that gives him trouble when he sits down.  Tr. 44.  He can't sit down for long on one side and he has to move over to the other side.  Tr. 44.  He can sit for about 15-20 minutes before having to stand up and try to walk a little bit.  Tr. 44.  He can only walk for about 10-15 minutes before he has to sit down.  Tr. 44.  The day of the hearing he drove to the hearing site and parked his car a couple of blocks away.  Tr. 44.  He was using a cane.  Tr. 44-45.  He has used a cane for about eight months, "It's gotten that bad at that time."  Tr. 45.  He also uses a TENS unit at night and stated that it helps him.  Tr. 45.

On an average day, with his medication, his pain is "bad."  Tr. 45.  He is having a hard time dealing with his back pain.  Tr. 46.  He has gotten injections in his back that help for about three days to a week and then he is back to square one.  Tr. 46.  He tried physical therapy but it made his hip hurt.  Tr. 46.  He has been seeing Dr. Morton, a specialist, for his back pain for two and a half years.  Tr. 47.  His most comfortable position is lying on his side and he does this for eight or nine hours a day.  Tr. 61.  He does some stretching and "physical" that Dr. Morton instructed him to do.  Tr. 61.  He wants to have surgery and stated that one of his doctors said that surgery is an option.  Tr. 62.  His providers recommended that he do physical therapy first to avoid surgery; he did so and got a little bit better, but then something that he does will cause "something and I pull something all the time."  Tr. 62.

Figueroa testified that he can no longer do the jobs that he used to do.  Tr. 52.  He used to do landscaping work and was a bagger at a supermarket; he would also take the carts out and put groceries in people's cars.  Tr. 53, 58.  He worked as a laborer in a refrigeration plant, which involved lifting aluminum foam panels with other workers and screwing them into place.  Tr. 56.  The heaviest he lifted at the refrigeration plant was about 40 pounds.  Tr. 57.

### 2. Vocational Expert's Testimony

Vocational Expert Ted Macy ("VE") testified at the hearing.  Tr. 64-74.  The ALJ discussed with the VE Figueroa's past relevant work as an assembler.  Tr. 43-44.  The ALJ asked the VE to determine whether a hypothetical individual could perform any jobs Figueroa performed in the past if that person had the following characteristics: can perform light work; can never climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs; can occasionally stoop, crouch and crawl; must avoid concentrated exposure to extreme cold, heat and humidity and all exposure to respiratory irritants one-third of the day or more; must avoid working around dangerous moving machinery that would require quick reflexes to get out the of way to prevent injury; can perform simple, routine and repetitive tasks and low stress jobs, i.e., occasional decision making and no more than occasional changes in the workplace setting; and can have brief and superficial interaction with the public and coworkers, i.e., speaking, signaling to accept instructions, carry out instructions, clarify, and ask questions concerning the instructions.  Tr. 66-67.  The VE testified that such a person could not perform Figueroa's past work.  Tr. 67.  The ALJ asked the VE if there are other jobs that the person could perform, and the VE testified that the person could perform jobs as a wire worker (105,000 national jobs, 750 northeast Ohio jobs), electronics worker (60,000 national jobs, 450 northeast Ohio jobs), and assembly press operator (110,000 national jobs, 660 northeast Ohio jobs).  Tr. 67.

Next, the ALJ asked the VE if his answer would change if the hypothetical individual described above would also require the use of a cane for ambulating distances, but would not need one to stand up, sit down, or balance.  Tr. 67-68.  The VE answered that some of the jobs identified might be feasible with that limitation, but that the jobs are typically performed by an individual who could be on their feet moving around from place to place for as much as six hours. Tr. 68.  If the individual could handle something that weighed up to 20 pounds with one hand and still use the cane to move around, such an individual could possibly perform the jobs identified; but often the jobs include cumbersome items to carry and may require two hands to move around and, thus, 66% to 75% of the jobs would be eliminated.  Tr. 68.  The ALJ asked if there were other jobs that such an individual could perform and the VE replied that such an individual could perform sedentary work as a table worker  (54,000 national jobs, 400 northeast Ohio jobs), final assembler (90,000 national jobs, 600 northeast Ohio jobs), and bonder (40,000 national jobs, 250 northeast Ohio jobs).  Tr. 68-69.  The ALJ asked the VE if his answers would change if the individual did not use a cane every day but would use the cane occasionally, i.e., three times a week.  Tr. 69.  The VE stated that his answers would not change.  Tr. 69.  The ALJ asked the VE if his answers would be impacted if both hypothetical individuals would be off task for any reason for five percent of the day and the VE stated that his answers would not change. Tr. 70.

Figueroa's attorney asked the VE to consider whether the ALJ's first hypothetical individual with the following changes would need an accommodation from an employer: could occasionally balance, rarely (no more than 10% of the time) kneel and crawl, and must frequently elevate his legs at a 45-90 degree angle.  Tr. 70-71.  The VE answered that such an individual could perform the sedentary jobs previously mentioned in response to the ALJ third

hypothetical, that an accommodation would not be required, but that the work station may not have the space available for leg elevation such that the number of jobs would be reduced by 50-85%.  Tr. 71-72.

Figueroa's attorney asked the VE if the individual described in the ALJ's third hypothetical could maintain employment if the individual would be off-task for ten percent of the time on a regular basis.  Tr. 72-73.  The VE answered that ten percent was on the cusp of acceptability and that most employers would allow it, but if it was more than ten percent they would not.  Tr. 73.  Figueroa's attorney asked the VE if a hypothetical worker of Figueroa's age, education and work experience performing unskilled work could maintain employment if he were to miss work two day a month on a regular basis.  Tr. 73.  The VE stated that such an individual would not be able to maintain employment absent a special accommodation.  Tr. 73.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her January 8, 2015, decision, the ALJ made the following findings:

---

[5] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

1.      The claimant has not engaged in substantial gainful activity since January 7, 2013, the application date.  Tr. 23.

2.      The claimant has the following severe impairments: epilepsy, lumbar disc disease, degenerative spurring at the acetabulum in the hips, bilaterally, asthma, bipolar, and marijuana abuse.  Tr. 23.

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 23.

4.      The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §416.967(b) except that he can never climb ladders ropes or scaffolds.  He can occasionally climb stairs and ramps.  He can occasionally stoop, crouch, and crawl.  He has unlimited capacities for balancing and kneeling.  He must avoid concentrated exposure to extreme cold, heat, and humidity.  He must avoid jobs that expose him to respiratory irritants one third of the day or more.  He cannot work around dangerous and moving machinery.  The claimant is limited to work that involves simple routine and repetitive type tasks.  He is limited to "low stress" jobs, with low stress being defined as no more than occasional decision making required and no more than occasional changes in his workplace setting.  He is limited to brief and superficial interaction with the public and coworkers.  "Brief and superficial" is defined as speaking and signaling to accept instructions, carry out instructions, clarify and ask questions concerning instructions.  Tr. 25.

5.      The claimant is unable to perform any past relevant work.  Tr. 28.

6.      The claimant was born on July 23, 1968 and was 44 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 28.

7.      The claimant has at least a high school education and is able to communicate in English.  Tr. 28.

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 28.

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 28.

10.     The claimant has not been under a disability, as defined in the Social
        Security Act, since January 7, 2013, the date the application was filed.
        Tr. 29.

## V. Parties' Arguments

Figueroa objects to the ALJ's decision on two grounds.  He asserts that the ALJ erred

when evaluating his musculoskeletal impairments at Step Three and failing to follow the treating

physician rule when considering Dr. Morton's opinion.  Doc. 15, pp. 12-20.  In response, the

Commissioner submits that substantial evidence supports the ALJ's findings at Step Three

because Figueroa does not show that he meets all the criteria of a listed impairment, and that her

consideration of Dr. Morton's opinion was not error.  Doc. 17, pp. 12-21.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681

(6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984).

### A.  Substantial evidence supports the ALJ's Step Three determination

At Step Three, an ALJ considers whether the claimant has an impairment that meets or

equals one of the listings in the Listing of Impairments. 20 C.F.R. §404.1520(a)(4)(iii).  A

claimant must meet all of the specified medical criteria to show that his impairment matches an impairment in the listings; an impairment that manifests only some of those criteria, no matter how severely, does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

The ALJ considered Figueroa's claimed physical impairments of epilepsy and asthma and then stated,

> The claimant's musculoskeletal impairments are considered under Listing 1.02 and 1.06. The claimant's reflexes and muscle strength are normal.  There are also descriptions of a normal gait (Ex. C18F pages 6-7 and Ex. C12F page 2).

Tr. 24.

Figueroa argues that the ALJ's assessment of Listing 1.02 (Major dysfunction of a joint(s) (due to any cause)) was insufficient and that she erred when she failed to consider Listing 1.04 (Disorders of the spine) at all.  Doc. 15, p. 14.  He criticizes the ALJ for considering Listing 1.06 (Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones) even though Listing 1.06 "does not even relate to back and hip impairments as it pertains to 'fracture of the femur, tibia, pelvis, or one or more of the tarsal bones,' something not alleged by Mr. Figueroa or absent in the record."  Doc. 15, p. 13.  Defendant submits that the ALJ's inclusion of Listing 1.06 was a typographical error given the fact that the ALJ referenced the criteria found in Listing 1.04 as it relates to Figueroa's impairment.  Doc. 17, p. 15.  Plaintiff did not respond to Defendant's assertion that the ALJ's inclusion of Listing 1.06 was a typographical error and that the ALJ meant to write "Listing 1.04."

The Court agrees with Defendant that the ALJ's inclusion of "Listing 1.06" was a typographical error and that the ALJ meant to write "Listing 1.04."  As Figueroa points out, there is no evidence in the record that Figueroa ever suffered a fracture of his femur, tibia, pelvis, or tarsal bones, a requirement for Listing 1.06.  Instead, there is evidence in the record indicating

20

that Figueroa had a back impairment that fits within Listing 1.04, disorders of the spine.

Moreover, in deciding that Figueroa did not meet a listed musculoskeletal impairment, the ALJ

remarked that he had normal strength and reflexes, which are requirements found in Listing 1.04,

not in Listings 1.02 or 1.06.  Thus, the Court will consider whether the ALJ erred in finding that

Figueroa's musculoskeletal impairments did not meet Listing 1.02 and Listing 1.04.

> Listing 1.02, Major dysfunction of a joint(s) (due to any cause), is, in pertinent part,
>
> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
>> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

20 C.F.R. Part 404, Subpart P, Appendix 1.

Figueroa argues that the ALJ erred because her analysis was "limited" and she ignored

Listing 1.02's requirements of pain, stiffness and limited motion, which are indicated in

Figueroa's treatment notes.  Doc. 15, p. 14.  However, a claimant must meet *all* the requirements

of a listing.  *See Sullivan*, 493 U.S. at 531 ("For a claimant to qualify for benefits by showing

that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed

impairment, he must present medical findings equal in severity to *all* the criteria for the one most

similar listed impairment." (emphasis in original)).  Here, the ALJ found that Figueroa had a

normal gait.  Tr. 24.  In other words, he did not have ineffective ambulation as described in

section 1.00B2b(2) as required by Listing 1.02.[6]  Because the ALJ found that Figueroa did not

---

[6]  Section 1.00B2b(2) defines ineffective ambulation as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities" such that the individual must use an assistive device that limits the functioning of both upper extremities.  Examples include an inability to walk without two canes or use standard public transportation.  *Id*.  As the ALJ noted elsewhere in her decision, Figueroa had a cane that he used "as needed," the record documents him not using his cane (Tr. 28, 26), and he used public transportation (Tr. 24).

meet the ineffective ambulation requirement, she did not need to discuss the other requirements in Listing 1.02.

Figueroa also asserts that the ALJ's citations to the record indicating a normal gait do not support her statement and that there is other evidence in the record showing that Figueroa had an antalgic gait and used a cane.  Doc. 15, p. 14.  The ALJ cited "C18F pages 6-7 and Ex. C12F page 2[]."  Tr. 24.  Figueroa criticizes the ALJ's citation of Exhibit C12F page 2 (Tr. 1004) because it is a mental health treatment record; however, he does not dispute that he was found at that visit (July 2014) to have a normal gait.  Exhibit C18F, pages 6-7, is a May 2014 visit to Dr. Morton wherein Figueroa stated that he ambulated with a straight cane as needed but that he was not using it that day.  Tr. 1226-1227.  Although Figueroa is correct that, at this visit, Dr. Morton observed that he had an antalgic gait (Tr. 1228), he does not dispute that he only used his cane "as needed" and was not using it the day he visited Dr. Morton.  Moreover, elsewhere in her decision the ALJ noted that, during the May 2014 visit, Dr. Morton observed an antalgic gait; she did not, therefore, "mistakenly review[] the medical evidence," as Figueroa suggests.  Tr. 26. Furthermore, Figueroa does not allege that he was unable to ambulate effectively and meet all the requirements of Listing 1.02.[7]  Accordingly, he does not satisfy his burden of showing that the ALJ committed error.  *See Zebley*, 493 U.S. at 530; *Drake v. Colvin*, 2014 WL 5431322, at *10-11 (N.D. Ohio Oct. 24, 2014) (ALJ's failure to consider Listings 1.02A and 1.03 at all were not error because evidence did not show claimant met all the specified medial criteria); *Beldsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006) (ALJ did not err when he failed to spell out

---

[7] Figueroa states that the ALJ erred because she failed to articulate her conclusion that he did not meet or equal a listing.  Doc. 15, p. 15.  He does not identify other evidence that would serve to show that he medically equaled a listing.  The ALJ discussed his asthma, epilepsy, and mental health impairments and Figueroa does not challenge these portions of the ALJ's decision.  *See* Doc. 15, p. 4, n.2.

every consideration that went into a Step Three analysis when the ALJ described pertinent

evidence elsewhere in the decision).

Figueroa also argues that the ALJ erred when she did not find that his back impairment

met Listing 1.04.  Doc. 15, pp. 14-15.  Listing 1.04 is defined, in pertinent part, as follows:

> Listing 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
>> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Part 404, Subpart P, Appendix 1.

Defendant points out that Figueroa had a lower back impairment but did not have positive

straight leg raise testing at both the sitting and supine positions.  Doc. 17, p. 17 (citing Dr.

Morton's treatment notes showing that, when distracted, Figueroa had a negative straight leg

raise test in the seated position).  Indeed, the ALJ remarked that Figueroa's treating physician,

Dr. Morton, observed that his straight leg raise tests were consistently negative when he was

distracted.  Tr. 26, 824, 1230, 1255, 1336.  And other positive straight leg raise testing in the

record do not indicate whether the test was performed in both the seated and supine position.

*See, e.g.*, Tr. 365.  Because Figueroa cannot show that he had positive straight leg raise testing in

both the seated and supine positions, he cannot show that he meets Listing 1.04.  *Zebley*, 493

U.S. at 530; *Wilcox v. Astrue*, 2012 WL 3238753, at *2 (N.D.Ohio Aug. 7, 2012) (a claimant

alleging that he meets Listing 1.04 based on a lower back impairment must show that he had positive straight leg raise testing in both the seated and supine positions).[8]

In sum, the ALJ's Step Three determination was adequately explained such that the Court is able to conduct a meaningful review.  Moreover, because Figueroa cannot show that he satisfies the criteria of Listings 1.02 or 1.04, any purported infirmity in the ALJ's Step Three determination is harmless.  *See Todd v. Astrue*, 2012 WL 2576435 at *10 (N.D. Ohio May 15, 2012) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result," quoting *Shkarbari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005)).

### B.  The ALJ failed to follow the treating physician rule

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th

---

[8]  To the extent that Figueroa argues, in a footnote, that the ALJ erred because she should have obtained an updated medical expert opinion to decide whether he equaled a listing (Doc. 15, p. 15 n.3), this argument fails.  Figueroa does not assert or identify evidence showing that he medically equals a listing, which is his burden.  *See Sullivan*, 493 U.S. at 531.

Cir. 2007).

Here, the ALJ considered Dr. Morton's opinion:

> As to treating source statements, Dr. Morton opined, on June 25, 2014, that the claimant could lift/carry 10-25 pounds occasionally and lesser weights more frequently.  He opined the claimant could stand/walk a total of 3-4 hours per workday and for 20-30 minutes at a time.  He opined that the claimant could sit 6 hours per workday, for 30-40 minutes at a time.  He also opined that the claimant would need to elevate his legs and would require four additional breaks in addition to the usual two given to all employees (Ex. C11F).

> Some weight is given to these opinions because they approach the light level of exertion determined by the previous ALJ and adopted by Dr. Hall, the state agency reviewing physician.  The requirement for elevating the legs is not consistent with any of the evidence of record.

Tr. 26.

Figueroa argues that the ALJ erred because she did not follow the requirements of the treating physician rule, i.e., the ALJ did not consider whether Dr. Morton's opinion was well-supported by the clinical and laboratory diagnostic techniques and not inconsistent with the record as a whole.  The Court agrees.[9]  Moreover, the fact that Dr. Morton's opinion allegedly "approach[ed] the light level of exertion" determined by the previous ALJ and adopted by state agency physician Dr. Hall does not sufficiently describe why the ALJ gave "some" weight to Dr. Morton's opinion; in other words, the ALJ did not provide good reasons that are sufficiently specific to make clear the reasons for the weight she gave to Dr. Morton's opinion.[10]  *Wilson*, 378 F.3d at 544.  Furthermore, the Court notes that Dr. Morton's opinion was based, in part, on a

---

[9]  Defendant submits that, pursuant to the rule in AR 98-4(6), 1998 WL 274052, at *3, an ALJ must adopt the previous ALJ's decision unless there is new and material evidence of a worsening condition and argues that the ALJ "found no new or material evidence, except for some change with respect to claimant's asthma."  Doc. 17, p. 19 (citing Tr. 21).  The fact that there is a prior decision does not relieve an ALJ from the requirements of the treating physician rule.

[10]  Dr. Hall opined that Figueroa could stand and/or walk for 6 hours in an 8-hour workday.  Tr. 135.  Dr. Morton opined that Figueroa could stand and/or walk for 3-4 hours for 20-30 minutes at a time in an eight-hour workday. Tr. 1001.

lumbar MRI taken on November 14, 2013 (Tr. 800, 1001); this MRI post-dated Dr. Hall's opinion (Tr. 136); and the ALJ did not discuss this MRI anywhere in her decision.  Because the ALJ failed to follow the treating physician rule, her decision must be reversed.  *Wilson*, 378 F.3d at 546-547.

### VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.[11]

Dated: March 16, 2017

Kathleen B. Burke
United States Magistrate Judge

.

---

[11]  This opinion should not be construed as a recommendation that, on remand, Figueroa be found disabled.